GORHAM & JOHNSON, INC., Appellant,

v.

CHRYSLER CORPORATION et al., Appellees.

No. 19235.

United States Court of Appeals Fifth Circuit.

Sept. 25, 1962.

Fred S. Abney, Dallas, Tex., for appellant.

James R. Rodgers, William H. Neary, Pinkney Grissom, Jerry Buchmeyer, Dallas, Tex., Keith A. Jenkins, Detroit, Mich., George S. Terry, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Tex., for appellees, Kelley, Drye, Newhall & Maginnes, New York City, Thompson, Knight, Wright & Simmons, Dallas, Tex., of counsel.

Before HUTCHESON, RIVES and BELL, Circuit Judges.

RIVES, Circuit Judge.

The plaintiff, Gorham & Johnson, Inc., sued the defendants, Chrysler Corporation, et al., claiming that the plaintiff had been injured in its business or property [1] by reason of the defendants' violations of the antitrust laws of the United States.[2] The second count of the complaint asserted a right to recover against Chrysler alone for the common-law tort designated by plaintiff as "Interference with Relational Interests."[3] Prior to the trial, the district court dismissed this second count. Plaintiff's brief concedes, however, that the tort action was

1. Specifically, that its business in Dallas, Texas, for retail dealing in Simca automobiles had been destroyed.

2. The pertinent provisions of the antitrust laws governing the case as submitted to the jury read as follows:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S.C.A. § 1.

3. Upon the general principle stated in 4 Restatement of Torts, Section 766, as follows:
"* * * one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with

grounded "upon precisely the same facts alleged in support of the antitrust violations." [4] The district court also refused to submit to the jury the plaintiff's requested instructions and special issues as to claimed violations of Section 2 of Title 15,[5] and of Section 18 of Title 15,[6] U.S. C.A. The court submitted the plaintiff's claims under section 1 of Title 15, U.S. C.A. (see n. 2, supra), to the jury upon special issues. The jury returned its verdict as follows:

"Special Issue No. 1: Do you find from a preponderance of the evidence that during the twelve-month period beginning in August of 1958, the plaintiff had an intention and was prepared to enter a business in Dallas for retail dealing in Simca automobiles manufactured in France by French Simca and distributed in the Dallas area by Kurland Motors of Denver, Colorado?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"Special Issue No. 1(a): Do you find from a preponderance of the evidence that during the twelve-month period beginning in August of 1958 the plaintiff actually established a business in Dallas for retail dealing in Simca automobiles manufactured in France by French Simca and distributed in the Dallas area by Kurland Motors of Denver, Colorado?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"Special Issue No. 2: Do you find from a preponderance of the evidence that in July of 1958 Chrysler entered into a contract, combination or conspiracy with H. T. Pigozzi and French Simca in which it was agreed that Chrysler would be the sole and exclusive distributor for Simca products in the United States and that all parties to such contract, combination or conspiracy would refuse to deal with any other distributor or dealer in Simca products in the United States unless Chrysler approved or consented thereto?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"If you have answered Special Issue No. 2 'Yes,' and only in that event, then answer the following Special Issue No. 3.

"Special Issue No. 3: Do you find from a preponderance of the evidence that from time to time after July of 1958 the following parties joined in and became a part of the contract, combination or conspiracy inquired about in Special Issue No. 2, if any you have found?

"Answer 'yes' or 'no' as to each party:

"Chrysler International, S.A.—Answer: Yes.

"Chrysler Motors—Answer: Yes.

"Simca, Inc.—Answer: Yes.

"Simca Western Division, Inc.—Answer: Yes.

---

another is liable to the other for the harm caused thereby."

**4.** The complaint alleged:
"This Honorable Court has jurisdiction of this Second Count of plaintiff's complaint because the factual circumstances supporting the ground for relief herein asserted are identical with the factual circumstances supporting the federal ground for relief asserted in First Count."

**5.** In pertinent part:
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or per-

sons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *." 15 U.S.C.A. § 2.

**6.** In pertinent part:
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.A. § 18.

"Kurland Motors—Answer: Yes.

"C. S. Hamilton Motor Company—Answer: Yes.

"Boedeker-Verner Motors—Answer: Yes.

"Plymouth Park Motors, Inc.—Answer: Yes.

"O. R. Mitchell Motors—Answer: Yes.

"Ira Young Auto Co., Inc.—Answer: Yes.

"If you have answered Special Issue No. 2 'Yes' and only in that event, then answer the following Special Issue No. 4.

"Special Issue No. 4: Do you find from a preponderance of the evidence that the contract, combination or conspiracy inquired about in Special Issue No. 2, if you have found same to exist, was an unreasonable restraint of trade or commerce among the several states or with foreign nations, as these terms have been explained to you in this charge?

"Answer 'Yes' or 'no.'

"Answer: No.

"If you have answered Special Issues No. 2 and No. 4 'No,' then do not answer the following special issue, but if you have answered either Special Issue No. 2 or Special Issue No. 4 'Yes,' then answer the following special issue.

"Special Issue No. 5: What sum of money, if any, would fairly and reasonably compensate the plaintiff for the damage, if any, sustained by him as a direct and proximate result of the conspiracy, if you have found same to exist?

"Answer by stating the amount in dollars and cents.

"Answer: None."

From the judgment for the defendants entered upon that verdict, the plaintiff appeals, urging four claimed errors as follows:

"FIRST POINT

"The district court erred in dismissing Second Count of appellant's fourth amended complaint.

"SECOND POINT

"The district court erred in refusing to submit to the jury appellant's requested instructions and special issues regarding appellant's claims of monopolization by the defendant Chrysler standing alone and by the several defendants in combination in violation of Section 2 of the Sherman Act.

"THIRD POINT

"The district court erred in refusing to submit to the jury the appellant's requested instructions and special issue regarding the appellant's claim that the effect of Chrysler's acquisition of twenty-five percent (25%) of French Simca's stock may be substantially to lessen competition or to tend to create a monopoly in the automobile line of commerce either in the United States generally or in Dallas County, Texas, in violation of Section 7 of the Clayton Act.

"FOURTH POINT

"The district court erred in excluding from evidence the appellant's Exhibits 40 and 41, being official publications of United States Senate Committee Reports describing the high degree of concentration in the American automobile industry, the domination and abuse of dealers by manufacturers, and the administered pricing policies and parallel practices with respect to design, styling and marketing that obtain within the industry and in excluding the testimony of the same character offered by appellant's witnesses."

The plaintiff claims that the destruction of its business as a retail dealer in Simca automobiles was brought about by Chrysler's acquisition of some 25% of the capital stock of Simca, S.A. of France (hereafter referred to as French

Simca), and by the resultant agreement under which Chrysler became the exclusive importer and distributor of Simca automobiles in the United States. In July 1958, Chrysler and H. T. Pigozzi, head of a group owning approximately 40% of the outstanding stock of French Simca, entered into an agreement referred to as the "Basic Agreement" on behalf of Pigozzi's group of stockholders and on behalf of French Simca. The agreement was executed by Pigozzi in Paris on July 21 and by Chrysler in Detroit on August 1. Chrysler agreed to acquire all the stock of French Simca then owned by Ford Motor Company, consisting of approximately 15% of the outstanding stock of French Simca, and to purchase an additional 10% of such stock, so that Chrysler would then own 25% of the stock of French Simca and Pigozzi's group would own 30%, and such respective holdings would not be changed except by mutual agreement. Two directors nominated by Chrysler were to be elected to the Board of Directors of French Simca. There was attached to the Basic Agreement as Exhibit "B" a form of distribution agreement for Simca products and for Chrysler products, under which Chrysler became the sole importer and distributor of Simca automobiles in the United States. The written distribution agreement was executed on September 22, but effective September 1, 1958.

Execution of the Basic Agreement was publicly announced throughout the Country and received wide publicity in the Dallas newspapers early in August, including the understanding that Chrysler "is becoming the sole distributor of Simca products in the United States."

Prior to the execution of the Basic Agreement, French Simca advised Chrysler that the agreements with Simca distributors in the United States were terminable at will by either party. On September 2, 1958, the day it commenced operations as the exclusive Simca distributor in the United States, Chrysler directed a letter to the ten Simca distributors in the United States and a letter to the Simca dealers of those distributors. The letter to the Simca distributors advised them that beginning September 2, 1958 Chrysler had assumed the responsibility for the distribution of Simca products in the United States. In it, Chrysler indicated that, in order to transfer the distribution functions in a smooth and orderly fashion and to permit the distributors to wind up their affairs in the most favorable manner under the circumstances, the distributors would be granted the opportunity to order Simca automobiles based on their previous commitments through December 1958. The letter also stated that since the Simca distributors were probably interested in continuing to sell Simca products at retail, the appropriate Simca Area Sales Manager at Chrysler Motors would contact the distributors to discuss this matter.

The letter of September 2, 1958 to the Simca dealers advised them that Chrysler had assumed responsibility for distribution of Simca products in the United States; that Chrysler Motors had offered to arrange for shipments of Simca cars to the ten distributors, according to their commitments, through December of 1958; and that they should order automobiles from their distributor through that date. This letter further stated that:

"*If you desire to continue as a Simca dealer, you should apply to this office.* Your qualifications will be carefully and thoroughly reviewed and considered. However, this letter should in no way be considered a commitment to enter into an agreement with you as a Simca Dealer." (Emphasis added.)

The importation and distribution of Simca products in the United States began in 1957 and were originally handled by Simca, Inc., incorporated under the laws of Delaware, a wholly owned subsidiary of French Simca. In May 1957, Simca, Inc., and Kurland Motors of Denver, Colorado, entered into a Distributor Sales Agreement for Simca Cars, under which Kurland Motors became the

distributor of 14 states including Texas. This agreement was terminable by either party upon six months' notice. In February 1958, French Simca changed its American distribution systems and appointed two new wholesalers. Simca, Inc., notified its distributors, including Kurland Motors, that "all franchises which we at present have with you are cancelled, effective in accordance with the terms of our agreements." Simca Western Division, Inc., which then had charge of the importation and distribution of Simca products in states west of the Mississippi River, wrote all distributors, including Kurland Motors, that it was "prepared to sell you these cars and spare parts at the established prices and under terms of payment as practiced in the past, pending negotiation of a new franchise agreement." No formal new franchise agreement was executed with Kurland Motors, but it continued to act as the Simca distributor in Texas.

Following the public announcement in August 1958 that Chrysler was becoming the sole distributor of Simca products in the United States, Kurland Motors took the position that it was entitled to reasonable but not less than six months' notice of the termination of its exclusive rights to distribute Simca cars. Eventually, however, by agreement dated November 28, 1958, Kurland Motors accepted the termination of its Simca distributorship.

Paul R. Gorham and L. H. Johnson, Jr., had been employees of Ranes Motors, Inc., which had been appointed by Kurland Motors as the franchise dealer for the sale of Simca automobiles and parts in Dallas. Ranes Motors continued as the franchise Simca dealer in Dallas during the first eight months of 1958, that is, through August of 1958, when it ceased operations. Meanwhile, its two employees Gorham and Johnson had negotiated for the Simca dealership which it was relinquishing. On August 13, 1958 they incorporated the plaintiff corporation and placed property in it of the value of $1,000.00. Their total ultimate contribution to capital came to either $10,589.00 or $11,789.00.

Gorham and Johnson had read the newspaper announcements in August that Chrysler was assuming the exclusive Simca distribution in the United States. However, on August 29, 1958, a representative of Kurland Motors told them that Kurland was still the distributor for Simca cars and that Chrysler's connection would be of no importance to them. The plaintiff acted on the faith of Kurland's representations and has now filed suit in Dallas against Kurland for damages based on the claim that Kurland misrepresented its authority to give the plaintiff a Simca franchise. On August 29, 1958 plaintiff executed an application for franchise to Kurland Motors and a form of Dealer Sales Agreement terminable by either party upon 30 days' written notice. Plaintiff received its first shipment of cars from Kurland Motors on September 4, 1958.

Plaintiff received from Ranes Motors its copy of Chrysler's letter dated September 2, 1958, addressed to all Simca dealers, and stating in part:

> "If you desire to continue as a Simca dealer, you should apply to this office. Your qualifications will be carefully and thoroughly reviewed and considered. However, this letter should in no way be considered a commitment to enter into an agreement with you as a Simca dealer."

The plaintiff never made application to Chrysler. Mr. Johnson testified: "We didn't want a contract with Chrysler." Moreover, the plaintiff made no effort to get any other dealership.

During September and October 1958, plaintiff purchased a total of 31 Simcas from Kurland Motors. In November Kurland advised the plaintiff that it had moved its inventory of Simca cars from Galveston, Texas, the port of entry, to Denver, Colorado. This change would require plaintiff to pay freight from Galveston to Denver and from Denver to Dallas, an increase of over $100.00 per car purchased from Kurland Motors.

Mr. Gorham testified that plaintiff quit dealing with Kurland because of this increase. On November 28, 1958, plaintiff was notified by telephone that Kurland had entered an agreement with Chrysler and would no longer be a distributor. On December 8, 1958 Kurland formally notified plaintiff of the termination of its dealer sales agreement, 30 days after receipt of notice.

Plaintiff continued in business as an unfranchised dealer securing Simca cars for resale by buying them from franchised dealers, or as, what is known in the colorful term of the automobile industry, a "bootleg dealer." As such, it had to provide the franchised dealer a profit of from $50.00 to $70.00 per car. There is evidence that when one of the franchised dealers objected to this "bootlegging" operation, Chrysler brought pressure to have it stopped. There was, however, no separate complaint for the alleged destruction of plaintiff's business as a "bootleg" Simca dealer. Instead, plaintiff contended and the jury found that, by refusing to deal with the plaintiff, each of the franchised dealers joined in and became a part of the Basic Agreement under which Chrysler became the sole distributor of Simca products in the United States. The plaintiff evidently did not consider it worthwhile to charge a separate conspiracy to destroy its business as a "bootleg dealer," for Mr. Gorham frankly conceded that "it would be pure speculation to attempt to say what Gorham & Johnson would have made had they continued as bootleg dealers or would have made buying cars at bootleg from other dealers." In the early part of 1959 plaintiff "decided to liquidate and go out of business."

█ We have sketched only a few of the salient facts developed in this complicated case, but enough, we believe, to show that the jury's verdict on Special Issue No. 5 was amply justified.

The failure of plaintiff's business as a retail dealer in Simca automobiles could reasonably have been believed by the jury to have resulted from any one of numerous causes. Inadequate capitalization, plaintiff's failure and refusal to apply to Chrysler for a dealership, its failure to seek a dealership in any other cars, the increase of freight charges by Kurland, and Kurland's alleged misrepresentation of its authority are but a few of the possible causes of plaintiff's loss.

The plaintiff filed no motion for new trial in the district court, and makes no complaint on appeal as to the sufficiency of the evidence to sustain the verdict of the jury. Plaintiff's "Fourth Point" on appeal directed to the exclusion from evidence of its Exhibits 40 and 41, official publications of United States Senate Committee Reports, might go to whether the defendants actually violated the antitrust laws or to the jury's answer to Special Issue No. 4, that the contract, combination or conspiracy was not an unreasonable restraint of trade or commerce. The exclusion of those exhibits does not go to the question of whether the plaintiff was damaged as the result of the contract or conspiracy. No error of any kind is claimed which would impeach or affect the jury's verdict on that issue. It follows that the verdict must be accepted as conclusively establishing that the plaintiff was not damaged as the result of the contract, combination or conspiracy referred to in Special Issue No. 2.

Actually, while the word "conspiracy" sounds sinister, it was used in this case as synonymous with "contract." As explained in the court's charge to the jury: "a conspiracy — and — 'contract,' 'combination' or 'conspiracy' mean essentially the same thing in this case — is an agreement between two or more persons shown either by words or by deeds." Special Issue No. 2 could be answered only in the affirmative, for there was no dispute about the contract in which it was agreed that Chrysler would be the sole distributor for Simca products in the United States.

Every legal theory asserted by the plaintiff—the common-law tort in Count 2; the claimed violations of Sections 2 and 18 of Title 15 U.S.C.A., which the

district court declined to submit to the jury; as well as the claimed violation of Section 1 of Title 15, as to which the jury found that there was no unreasonable restraint of trade or commerce—each and all of these legal theories depend for their validity upon the plaintiff's having sustained damage as the result of the contract by which Chrysler became the sole distributor for Simca products in the United States.

The breadth of Special Issue No. 5 is pointed up by what occurred during the course of the jury's deliberations as disclosed by a stipulation in the record:

"* * * that during the course of the proceedings had upon the trial on the merits of the above cause and after the jury had received the charge of the Court and retired to the jury room but prior to the time it returned its verdict, the foreman of the jury addressed a written inquiry to the Judge which was delivered to him in due course by the deputy marshal. After calling in and consulting with counsel for all parties, the Judge indorsed upon a lower part of the same paper bearing the inquiry his response thereto and thereafter in due course the paper containing the inquiry and the response was delivered by the deputy marshal to the foreman of the jury.

"Prior to directing the deputy marshal to return such inquiry and his response, the district Judge read both the inquiry and the response to counsel for all parties and no objection was made upon the part of any party, and all parties agreed to the action of the Court.

"The paper containing the inquiry made by the jury and the response of the Judge thereto has been lost or misplaced and is not available for inclusion in the record on appeal of this cause.

"The substance of the inquiry so made was: since this was an anti-trust case, whether it would be necessary for the jury to answer Special Issue No. 5 inasmuch as the jury had answered 'no' to Special Issue No. 4.

"The substance of the reply indorsed by the Judge immediately below such inquiry was: that the matter inquired about had been covered by the instructions contained in the charge of the Court and that no further instructions or interpretation was required."

The district court carefully refrained from restricting Special Issue No. 5 to the particular claim which it submitted to the jury based on a violation of Section 1, Title 15 U.S.C.A. Instead, the court required the jury by Special Issue No. 5 to ascertain the damages, if any, as a result of the exclusive distributorship agreement inquired about in Special Issue No. 2. The jury's answer, therefore, established that the plaintiff sustained no damage under any legal theory which it had asserted.

That finding forecloses plaintiff from any relief on any theory of violation of the antitrust laws, for a private suit under those laws is permitted only by "any person who shall be injured in his business or property by reason of any thing forbidden in the antitrust laws." 15 U.S.C.A. § 15. It demonstrates that any possible error in dismissing the second count of the complaint claiming for a common-law tort "upon precisely the same facts alleged in support of the antitrust violations" would be error without injury. It precludes a ruling on plaintiff's "Fourth Point" directed to the exclusion of plaintiff's Exhibits 40 and 41 which are relevant to the existence of an unreasonable restraint of trade or commerce and not to the question of damages.

It results that none of the four claimed errors can amount to reversible error, and the judgment is

Affirmed.