**GARRETT'S INC., Plaintiff,**

v.

**FARAH MANUFACTURING COMPANY, INC., Defendant.**

**Civ. A. No. 75–1364.**

United States District Court, D. South Carolina, Anderson Division.

April 12, 1976.

G. Ross Anderson, Jr., and Karl L. Kenyon, of Anderson, Kenyon & Epps, Anderson, S. C., for plaintiff.

H. Grady Kirven, of Watkins, Vandiver, Kirven, Long & Gable, Anderson, S. C., and Edwin H. Pewett, and James M. Kefauver, of Glassie, Pewett, Beebe & Shanks, Washington, D. C., for defendant.

## FINDINGS OF FACT

## CONCLUSIONS OF LAW AND ORDER

HEMPHILL, District Judge.

This antitrust case was tried before the court without a jury, at Greenville, South Carolina, on March 26, 1976. Plaintiff's amended complaint alleged certain violations of the Sherman Antitrust Act, 15 U.S.C., § 1 *et seq.*[1] Defendant's answer to the amended complaint denied the essential allegations of the amended complaint. After hearing and considering the testimony adduced at trial, and after considering the various pleadings, exhibits and submissions admitted into evidence, including a review of the court's notes taken at the time of trial, upon the credible evidence presented, this court publishes the following:

## FINDINGS OF FACT

1. Plaintiff is a business corporation organized and existing under the laws of the State of South Carolina and is, and was during times material to the issues here, engaged in the business of selling clothing at retail to the general public in three stores located respectively in Anderson, Clemson and Easley, South Carolina.

2. Defendant is a corporation organized and existing under the laws of the State of Texas and engaged in the manufacture and sale of men's clothing under the brand name "Farah". Defendant sells its merchandise to retailers throughout the United States and abroad. Its sales personnel are employees of Farah Sales Corporation, a wholly-owned subsidiary of defendant.

3. For a number of years prior to 1974, defendant sold to plaintiff its line of men's slacks for resale by the plaintiff to consumers at the retail level.

4. In June, 1974, defendant stopped soliciting orders from plaintiff and from that time to the time the plaintiff's complaint was filed has not sold any of its products to plaintiff.

## SUBSTANTIVE CHARGES

5. On or about June 5, 1974, defendant's salesman, Mr. Ron Smith, in whose sales territory plaintiff's retail stores were located, entered one of plaintiff's retail stores and observed that most of the merchandise being offered for sale therein was discounted by as much as 50% and that numerous "sale" signs were displayed throughout the store. In addition, Mr. Smith specifically noted that "current"[2] Farah merchandise with a suggested retail price of $18.00 was being sold for $9.00.

6. Later in the day Smith telephoned Mr. William Howard, defendant's regional sales manager and reported to him that

---

1. The amended complaint also alleged a violation of the Robinson-Patman Antidiscrimination Act (15 U.S.C. § 13). However, at the pretrial conference counsel for plaintiff limited plaintiff's claim to the alleged violation of the Sherman Act and, moreover, no evidence was adduced at trial to support any claim of a violation of the Robinson-Patman Act.

2. The term "current" has special significance in the context of this litigation in that a distinction is made between merchandise which is "in season," *i. e.*, "current" and that which is "out of season" or "non-current." Defendant's express policy of doing business, as testified to by William Howard, one of its regional sales managers, is not to sell to retailers who discount the suggested retail price of "current" Farah merchandise. Defendant's salesmen are instructed to report to the company any such incidents, which instruction Mr. Smith promptly followed in the instant case.

plaintiff, in his (Smith's) opinion, was becoming a discount house and specifically reported that current Farah merchandise was being sold at 50% below the suggested retail price.

7. Howard told Smith that he would get back to him shortly. After placing a call to defendant's company attorney, Howard made the decision to discontinue selling to plaintiff and instructed Smith to discontinue calling on plaintiff and not to discuss the matter with anyone.

8. Smith followed the instructions of Howard and never discussed the matter further. Moreover, in accordance with Farah's established policy, Smith never at any time discussed with any retailer the retail prices to be charged for Farah merchandise. A copy of Smith's salesman's agreement with Farah (defendant's Exhibit A) was introduced in evidence; the agreement provided that salesmen were never to discuss the question of retail pricing with anyone and in particular with retailers with whom Farah dealt. Smith testified that he uniformly complied with that agreement and that he believed that he would be fired if he did not do so.

9. On this latter point the evidence is in some conflict. Mr. Richard Garrett, chief stockholder and general manager of plaintiff, testified that Smith had discussed the question of retail pricing with him, and that Smith had stated that plaintiff would be "cut-off" from Farah merchandise if plaintiff sold Farah merchandise at prices below the suggested retail prices. This testimony was corroborated by Gladys Cape, plaintiff's buyer, and a Mrs. Vicky Garrett, Mr. Garrett's daughter-in-law and the manager of one of plaintiff's stores.

10. In addition to Smith's express denial of ever discussing retail pricing of Farah merchandise with any retailer, including plaintiff, defendant called as witnesses officers and buyers from the leading retail department stores in plaintiff's trade area —Gallant-Belk, Belk-Simpson and Meyers-Arnold. Each of these witnesses corroborated Smith's testimony that he had not discussed retail pricing with them.

■ 11. Mr. Fred Wood, the men's wear buyer at Meyers-Arnold, testified that he dealt directly with Smith in the purchase of Farah merchandise and that Smith never once discussed retail pricing of Farah merchandise with him. The men's wear buyer for Gallant-Belk, Mr. James Burden, testified that in over six years of dealing with Smith no discussion of retail pricing ever took place except for one instance, the time of which was not in evidence, when Burden mentioned to Smith that another retailer was selling Farah merchandise below the suggested retail price.[3] Mr. Ted Chellis, merchandise manager for ladies' and children's wear at the Belk-Simpson department stores, testified that he dealt frequently with Smith in his previous capacity as men's and boys' wear buyer. He, too, testified that he never discussed with Smith, nor did Smith ever initiate any discussion with respect to, the retail pricing of Farah merchandise. Officers of these retail concerns testified that Smith had never discussed retail pricing with them and that they had no knowledge of any such discussions having occurred between Mr. Smith and employees of their respective companies.

■ 12. The court finds that the plaintiff has failed to sustain its burden of proof with respect to its allegation that defendant, through its salesman, ever threatened to discontinue selling Farah merchandise to plaintiff unless plaintiff adhered to the sug-

---

3. It should be noted that this fact alone lends no support to plaintiff's case. The fact that a retailer merely mentions or indeed complains of another retailer's pricing is insufficient to show a conspiracy. *See Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963); *Carbon Steel Products Corp. v. Alan Wood Steel Company*, 289 F.Supp. 584, 588 (S.D.N.Y.1968), where the court remarked:

A combination violative of Section 1 of the Sherman Act cannot be implied from the fact that some of Wood's customers complained of Carbon Steel's practices, since it was the normal working of the marketplace for them to have done so.

*See also Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951).

gested retail prices for current Farah merchandise. One cannot escape the fact that plaintiff's witnesses must be considered at least interested parties, whereas defendant produced numerous witnesses who are/were not employed by defendant and, except for their business dealings with defendant, were/are not related to defendant.

13. There was also a conflict in the testimony with respect to an alleged agreement between Farah and other retailers in plaintiff's trade area, specifically Meyers-Arnold and the Belk stores, with respect to the retail prices of Farah merchandise. On direct examination, Mr. Garrett testified that in late November or early December of 1973, Smith told him that he (Smith) had secured an agreement from Meyers-Arnold and the Belk stores to hold prices on Farah merchandise at the suggested retail price level. Smith, according to Mr. Garrett, further stated that those concerns would hold the price on Farah merchandise if plaintiff would do so. Smith denied ever reaching, or attempting to reach, any such agreement with Meyers-Arnold or the Belk stores, and expressly denied ever telling Garrett that any such agreement had been reached. The testimony that Smith never reached or attempted to reach any such agreement with Meyers-Arnold or the Belk stores was corroborated by the testimony of representatives of those concerns. These representatives, in addition, testified that they had never complained to Smith about plaintiff's pricing of Farah merchandise and had never threatened to stop purchasing, or cut back on purchasing, Farah merchandise unless Smith discontinued dealing with plaintiff. The only testimony which would even tend to corroborate Garrett's testimony as to what Smith told him about the agreement with these other retailers was that of Mrs. Catherine Ballard, a checker at one of plaintiff's stores, who testified merely that on or about the date in question Smith and Garrett had a conversation. She could not, however, testify as to the nature of the conversation since she was not present during the conversation.

14. Garrett also testified that Smith told him the alleged agreement to maintain prices on Farah merchandise was to be implemented by a system of "spying", whereby the employees of Meyers-Arnold and the Belk stores, respectively, would check the pricing of Farah merchandise by their competitors, including plaintiff, in order to police the alleged price maintenance scheme. As evidence of such "spying", plaintiff introduced at trial a piece of paper (plaintiff's Exhibit 33) which Garrett had taken from two employees of Belk-Simpson. This document contained notations of prices of certain items of merchandise being sold in one of plaintiff's stores. Upon examination the document reflects that the prices being checked were not prices on Farah merchandise but rather prices of various ladies' wearing apparel, and that prices of ladies' wearing appeal in another local retail establishment, Suzanne's, also had been checked earlier the same day by the Belk-Simpson employees.[4]

15. Defendant called as witnesses the two individuals involved in this "spying" incident, a Mrs. Lou Ellen Holcombe, a buyer with Belk-Simpson, and Mr. Ted Chellis, previously mentioned. Mrs. Holcombe testified that she had gone to plaintiff's store (and to Suzanne's) on her lunch hour in order to see what was being currently merchandised, and that Mr. Chellis had accompanied her to become familiar with the ladies' wear market because shortly prior thereto he had been assigned to that department of Belk-Simpson. They testified that they did not go to plaintiff's store at the direction of Smith or of any person associated with Belk-Simpson, but did so on their own initiative, and without the knowledge or approval of Smith or anyone at Belk-Simpson, simply to keep current on what competitors were doing in the particular merchandise lines of interest to Mrs. Holcombe and Mr. Chellis. This incident occurred in December, 1975, almost a year and a half after Smith had stopped soliciting orders from plaintiff.

4. It is generally known that "comparison shoppers" are used by merchants to find out the prices possible competitors are putting on retail goods.

16. The only other evidence of "spying" on plaintiff by other retailers was a document (plaintiff's Exhibit 34), which apparently was taken from an employee of Meyers-Arnold who had marked certain merchandise code numbers and prices thereon. This document was dated February 23, 1976, long after Smith had stopped soliciting orders from plaintiff and long after the complaint in this action was filed. This document, like that taken from the Belk-Simpson employees, contained no reference to Farah merchandise.

17. In addition, Mr. Eugene H. Bishop, the President and Chief Operating Officer of Meyers-Arnold, testified that for at least eight years it had been a policy of Meyers-Arnold never to be undersold by a competitor, and that in implementing this policy, Meyers-Arnold employees would check prices of items reported by its customers as being sold by other retailers at less than the current Meyers-Arnold prices. This policy applied to all merchandise and, pursuant thereto, Meyers-Arnold employees had checked prices not only in plaintiff's stores but in Belk stores and numerous other stores as well. Accordingly, the court finds that the "spying"—which Mr. Garrett testified was "part and parcel" of the price fixing scheme as related to him by Mr. Smith—was not undertaken at the behest of defendant, and, moreover, such spying did not even involve defendant or merchandise manufactured by it.

18. Further, Bishop testified to a telephone conversation which he had with Garrett in which the latter accused Meyers-Arnold of price fixing. Bishop asked Garrett who among Meyers-Arnold employees was doing this, to which Mr. Garrett replied that he did not know. This telephone conversation occurred in July, 1975, a month before the complaint herein was filed and over a year after Smith had stopped soliciting orders from plaintiff. This testimony casts serious doubt on the veracity of Garrett's testimony that, in early December, 1973, Smith told him of a price fixing agreement involving Farah and Meyers-Arnold.

19. The court finds that the facts fail to demonstrate by a preponderance of the evidence that defendant attempted to, or did in fact, enter into any agreement, or engage in any conspiracy, to maintain the suggested retail prices for Farah merchandise. The court also finds that defendant's discontinuance of dealings with plaintiff was not pursuant to, or in furtherance of, any agreement or conspiracy, but rather was the result of a unilateral determination made by defendant's representatives, specifically by Howard, on information received from Smith in accord with defendant's policy as to types of retailers with which it wished to deal.

## AS TO INJURY AND DAMAGES [5]

20. Plaintiff's Exhibit 38 [6] set forth in dollars the amounts of merchandise which plaintiff purchased from defendant in the years 1962 through 1974. In attempting to establish gross profits lost from not having Farah merchandise, Garrett testified that plaintiff's gross profit on the sale of Farah merchandise was 80% of the amount of purchases. This figure was based on his testimony that plaintiff sold 80% of its Farah merchandise at the suggested retail prices, which were double the cost to plaintiff. Mr. Garrett further testified on cross-examination that periodically Farah merchandise was sold at varying percentages, up to 50%, below the suggested retail prices, and admitted that the 80% figure was a "guess". There was no evidence to show the amounts of Farah merchandise *sold* (as opposed to *purchased*) in any given year. In sum, plaintiff offered no credible evidence, not even estimates based on some

5. Although plaintiff, in the opinion of this court, has failed to meet its initial burden of proof of violation of the Sherman Act, this court faces every issue of the case.

6. This exhibit is entitled "Annual Sales Volume Of Farah Merchandise", but it was stipulated by counsel that the amounts set forth thereon represented purchases, not sales, in the years indicated.

reasonable foundation, to show its gross profits in any year from the sale of Farah merchandise. This deficiency in plaintiff's evidence makes impossible any showing of any loss of future *gross* profits from not having Farah merchandise, much less the requisite showing of loss of future *net* profits.

21. Garrett testified that the line of slacks (W. Koury) which plaintiff handled in place of the Farah line was so unacceptable to plaintiff's customers that it was liquidated at no profit, or at a loss. On cross-examination, Mr. Garrett was confronted with the statement in plaintiff's answers to defendant's interrogatories that:

> In 1975, all Garrett's establishments invoiced approximately $25,224.42 of merchandise from W. Koury. Revenue from the sale of this merchandise would have been approximately double this amount except for the periodic sales at reduced prices.

Garrett was unable to explain his prior testimony that the W. Koury merchandise had been sold at no profit in light of the aforesaid contradictory statement in plaintiff's answers to interrogatories. Consequently, there is no credible evidence to show plaintiff's profits realized from the sale of W. Koury slacks in 1975. Such profits would have to be deducted from any projected loss of profits which plaintiff would have realized from the sale of Farah merchandise in 1975, if plaintiff had been able to purchase Farah merchandise in 1975.

22. The court finds that plaintiff produced no acceptable proof of either gross profits or net profits realized from its sale of Farah merchandise, on the basis of which any loss of future gross or net profits could be estimated. Plaintiff's evidence on these matters was entirely speculation or guesswork on the part of Garrett. Except for Garrett's statement that retail market conditions remained constant as between 1974–75, a statement which was shown on cross-examination to be without any factual basis, the record is silent as to the retail market conditions in plaintiff's trade area

during the period of time for which damages based on loss of future profits were claimed.

23. Garrett testified that plaintiff would have continued to buy Farah merchandise except for the fact that defendant had refused to deal with him. He attributed the drop in plaintiff's gross profits in the year 1975 to the fact that plaintiff had been unable to obtain Farah merchandise. This conclusion in turn was based on his testimony that plaintiff had "built its business around Farah". On cross-examination, however, it was demonstrated that there was no correlation whatever between plaintiff's annual gross profits in the three years preceding 1975 and the volume of Farah merchandise which plaintiff purchased in those years. For example, Garrett testified that in 1972 plaintiff's gross profits were $230,016, while its purchases of Farah merchandise totalled $31,544. In 1973, plaintiff's gross profits increased to $247,659, despite the fact that plaintiff's purchases of Farah merchandise dropped by approximately one-third to $22,976. Finally, in 1974, plaintiff's gross profits dropped to $204,473, while its purchases of Farah merchandise almost doubled (from $22,976 to $42,396). Accordingly, the court finds that Mr. Garrett's testimony that he had built his business around Farah is contradicted by undisputed evidence, and that plaintiff's gross profits were not dependent on its volume of purchases from defendant.

24. Garrett also testified that he estimated it would take plaintiff approximately one year to build its business back up to the level at which it was in 1974 if plaintiff could again obtain merchandise from Farah. He testified further that he estimated if plaintiff had to purchase and sell at retail a substitute for the Farah line, it would take plaintiff approximately five years to build plaintiff's business to the level existing while he carried Farah merchandise. On cross-examination, however, Garrett admitted that both estimates were "guesses". Counsel for defendant objected to the admission of any proof regarding damages

incurred subsequent to the date the plaintiff's complaint was filed.[7]

25. For plaintiff to recover damages based on a reduction in its overall profits in the year 1975 by reason of its not having Farah merchandise, plaintiff would have to prove that its overall profits in preceding years rose and fell in some proportion to the amount of Farah merchandise which it purchased and sold in those years. As noted above, plaintiff failed to establish any such relationship; indeed, the evidence of plaintiff's level of profits in the years 1972, 1973, and 1974 and its purchases of Farah merchandise affirmatively shows the absence of any such relationship. Further, plaintiff failed to show that the reduction in its overall profits in 1975 was not the result of some factor other than its not purchasing Farah merchandise in that year.

AND

CONCLUSIONS OF LAW

A. This is an action for treble damages brought under Section 4 of the Clayton Act (15 U.S.C. § 15) alleging a violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).[8]

B. The principal issue in this case is whether defendant's conduct in ceasing to solicit orders from plaintiff was the result of an agreement or conspiracy, and thereby violative of § 1 of the Sherman Act, which provides in pertinent part that:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

C. Plaintiff had the burden of proving by a preponderance of the evidence that defendant's refusal to deal did in fact arise out of an unlawful agreement or conspiracy, that plaintiff sustained actual injury to its business or property as a result of the violation, and the amount of damages sustained. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 694–95 (5th Cir. 1975); *Gray v. Shell Oil Company,* 469 F.2d 742 (9th Cir. 1972), *cert. denied* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Hunter Douglas Corporation v. Lando Products, Inc.,* 235 F.2d 631 (9th Cir. 1956); *Wolfe v. National Lead Company,* 225 F.2d 427 (9th Cir. 1955), *cert. denied,* 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); *Council for the Advancement of the Psychological Professions and Sciences v. Blue Cross Association,* 383 F.Supp. 984 (D.D.C.1974).

D. A mere refusal to deal, without more, is insufficient as a matter of law to sustain liability against defendant under the Sherman Act. *See, e. g., United States v. Parke Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Klein v. American Luggage Works, Inc., supra; Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *Graham v. Triangle Publications, Inc.,* 283 F.Supp. 825 (E.D.Pa.1964), *aff'd,* 344 F.2d 775 (3rd Cir. 1965); *Carbon Steel Products Corp. v. Alan Wood Steel Co., supra.*

E. In accordance with the foregoing findings of fact, the court concludes that plaintiff failed to sustain its burden of proving that defendant's refusal to continue to solicit orders from plaintiff was pursuant to, or in furtherance of, any agreement or conspiracy, and therefore in violation of the Sherman Act. The court concludes that defendant's action was no more than a unilateral act on its part consistent with its established policy of not dealing with retail-

---

7. Defendant's objection appears to be well-founded. *See, e. g., Lawlor v. Loewe,* 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341 (1915); *Flintkote Company v. Lysfjord,* 246 F.2d 368 (9th Cir. 1957), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). However, because of

its other findings with regard to plaintiff's proof of damages, the court finds it unnecessary to decide this issue.

8. See footnote 1, *supra.*

ers which offer for sale or sell current Farah merchandise at prices below the suggested retail prices, and of not dealing with discount operations generally. Under *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) and *Parke, Davis, supra,* a manufacturer, absent monopoly power not demonstrated here, may select the customers with which it wishes to deal and, acting unilaterally, may discontinue dealing with customers with which it does not wish to deal, including customers which have sold the manufacturer's products at prices below the manufacturer's suggested retail prices.

■ In *Osborn v. Sinclair Refining Co.,* 324 F.2d 566 (4th Cir. 1963), the Fourth Circuit found that the scope of allowable conduct under *Colgate* was rather narrow and stated:

There [in *United States v. Parke, Davis & Co.*] the Court indicated that if a seller does no more than announce a policy designed to restrain trade, and declines to sell to those who fail to adhere to the policy, he has not put together a combination or arrangement violative of the antitrust laws. However, the Court emphasized that if the seller goes further, if he engages in actions extending beyond the bare announcement of his policy and the declination to sell "and he employs other means which effect adherence" to his policy, he has engaged in a combination or arrangement condemned by the antitrust laws. He can then no longer rely upon his "right" of customer rejection. There is no indication in *Parke, Davis,* or in any other case, that these principles regarding refusals to deal vary, depending upon whether there is a monopoly or concerted action with co-conspirators, or whether, on the other hand, there exists some other form of arrangement in restraint of trade. *To the contrary, irrespective of monopoly or conspiracy, if the seller pressures his customers or dealers into adhering to resale price maintenance, or exclusive dealing or tie-ins, he has put together an unlawful arrangement and taken*

*himself outside the narrow protection afforded by Colgate. Id.* at 573 (emphasis added).

In a footnote, the court in *Osborn* quoted some well-known language from *George W. Warner & Co. v. Black & Decker Mfg. Co.,* 277 F.2d 787, 790 (2d Cir. 1960):

The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise.

*Osborn* expresses the law in this circuit, and presumably in others as well, but the facts as found by the court do not bring defendant's conduct in this case within the scope of that decision. Though the only available *legal* channel in an action such as this is narrow and treacherous indeed, the credible evidence presented shows that defendant has charted and sailed a course simple enough to negotiate it successfully.

In a supplemental memorandum to the court, plaintiff relies upon *United States v. General Motors,* 384 U.S. 127, 145, 86 S.Ct. 1321, 1330, 16 L.Ed.2d 415, 426 (1966), where the Court held: "Elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act." Plaintiff's reliance is misplaced, however, because the key to the Court's holding in *General Motors* was the finding of joint collaborative action, *i. e.* a conspiracy, which plaintiff alleged in this case but was unable to prove. *A. C. Becken Co. v. Gemex Corp.,* 272 F.2d 1 (7th Cir. 1959) is similarly distinguishable; there the court found evidence, which is absent here, to establish plaintiff's allegations of a price-fixing conspiracy with other wholesalers competing with plaintiff.

■ F. In addition to proving a substantive violation of the Sherman Act, which plaintiff failed to do, plaintiff had the burden of proving by a preponderance of the evidence that it sustained injury to its business or property by reason of the alleged violation. See cases cited in Conclu-

sion C above. Accordingly, for the plaintiff to prevail, it must have shown that it was in fact injured by defendant's ceasing to solicit orders from plaintiff and that any such injury was not caused by plaintiff's own conduct, either by way of acts of commission or omission. *See Wolfe v. National Lead Company, supra,* at 430; *Gorham and Johnson, Inc. v. Chrysler Corporation,* 308 F.2d 462 (5th Cir. 1962), *cert. denied,* 372 U.S. 912, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963). Plaintiff has failed to show such injury here.

■■■ G. Finally, plaintiff had the burden of proving by a preponderance of the evidence the amount of damages actually sustained as a result of the violation. *See Zenith Radio Corp. v. Hazeltine Research, Inc., supra.* The determination of the amount of damages may not rest on mere guesswork or speculation. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753 (6th Cir. 1965), *cert. denied,* 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965); *Loew's, Inc. v. Cinema Amusements, Inc.,* 210 F.2d 86 (10th Cir. 1954), *cert. denied,* 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954). As the court in *Keough v. Chicago & N. W. Ry. Co.,* 260 U.S. 156, 164–65, 43 S.Ct. 47, 50, 67 L.Ed. 183, 188 (1922) remarked:

> [R]ecovery cannot be had unless it is shown that, as a result of defendants' acts, damages in some amount susceptible of express figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture.

■■■ H. Here plaintiff rested its claim of damages on lost profits based on the assumption that it would have made a profit on the retail sale of Farah merchandise had it been able to obtain same. However, as shown in the above Findings of Fact, plaintiff failed to prove any basis, bottomed on reasonable estimates, for quantifying any loss of profits. Plaintiff's proffered evidence on damages was predicated entirely on speculation and guesswork. In short,

plaintiff failed to establish an adequate basis for the computation of gross profits realized from the sale of Farah merchandise prior to the alleged violation, and further failed to prove that such profits, even if adequately proven, would be a fair or adequate measure for the computation of lost "anticipated" profits. Plaintiff is barred from recovery based "on the strength of [its] allegations of hypothetical losses . . . ." *Image & Sound Service Corp. v. Altec Service Corp.,* 148 F.Supp. 237, 240 (D.Mass.1956).

The evidence on damages lacks the necessary "reasonable basis of computation." *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 691 (1927). Plaintiff cites *Eastman Kodak* in support of its contention that damages have been proved adequately and also regards as "directly in point factually and legally," *A. C. Becken Co. v. Gemex Corp.,* 272 F.2d 1 (7th Cir. 1959). In that case the court found that plaintiff's proof of damages was adequate and that the evidence showed "that there was no speculation as to the fact of actual damage and that plaintiff's business was seriously curtailed by the cutoff by defendant." *Id.* at 5. Plaintiff has failed to establish by a preponderance of the evidence that such facts exist here.

■■■ I. In addition to plaintiff's failure of proof with regard to gross profits, plaintiff failed to prove adequately the amount of *net* profits it would have realized but for defendant's actions. No evidence was introduced to relate plaintiff's operating expenses to plaintiff's sale of Farah merchandise. Failure to show net profits directly attributable to plaintiff's sale of Farah merchandise made impossible any showing of any loss of future net profits which plaintiff would have realized had it continued to purchase and sell at retail Farah merchandise. This failure of proof is fatal to recovery by plaintiff. *See, e. g., Wolfe v. National Lead Co., supra; Peter v. Union Oil Co. of Calif.,* 328 F.Supp. 998, 1003 (C.D. Calif.1971); *2361 State Corp. v. Sealy, Inc.,* 263 F.Supp. 845, 853 (N.D.Ill.1967); *Sieg-*

*fried v. Kansas City Star Corp.,* 193 F.Supp. 427 (W.D.Mo.1961), *aff'd.,* 298 F.2d 1 (9th Cir. 1962), *cert. denied,* 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

■ J. As noted in the Findings of Fact, plaintiff was unable to show any correlation between its overall annual gross profits and the amount of Farah merchandise which it purchased annually. Accordingly, plaintiff failed to establish any injury or damages based on impact on plaintiff's overall annual gross profits, proof of which the plaintiff not only had the burden of producing but which must be assumed to lie "peculiarly within his possession." *See Klein v. American Luggage Works, Inc.,* supra, at 945.

■ K. The court concludes that plaintiff has failed to sustain its burden of proof with respect to injury and damages, so that even if a violation of the Sherman Act had been proved, a verdict for defendant would have to be entered. Where "proper proof of injury and of damage was missing, the district judge should have directed a verdict for defendant . . . ." *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 695 (5th Cir. 1975).

### ORDER

In accordance with the court's Findings of Fact and Conclusions of Law filed this 12th day of April, 1976, the Clerk shall enter judgment that:

Plaintiff's amended complaint be dismissed with prejudice; judgment shall be, and the same hereby is, entered in favor of defendant as against plaintiff.

Costs shall be borne by plaintiff.

AND IT IS SO ORDERED.