PECKHAM, Senior District Judge:
 

 Tidmore Oil Company appeals the district court’s grant of summary judgment to defendant BP Oil Company. The court granted judgment on Tidmore’s first claim (violation of section 1 of the Sherman Act) on the ground that Tidmore had failed to allege the existence of an “agreement” in restraint of trade. The court granted summary judgment on Tidmore’s second claim (breach of contract) on the ground that the covenant of good faith and fair dealing, on which Tidmore’s claim depended, could not be applied to this contract. We affirm.
 

 I. BACKGROUND
 

 A.
 
 Facts
 

 Tidmore Oil Company (“Tidmore”) is a wholesaler and retail marketer (known as a “jobber”) of Gulf-branded petroleum products. Tidmore distributes gasoline wholesale to numerous locations in nine Alabama counties and retails gasoline directly through a smaller number of outlets in the same area.
 

 BP Oil Company/Gulf Products Division (“BP”) is a major refiner and retailer of petroleum products. BP markets its products as a dual distributor through jobbers such as Tidmore and directly through its own company-operated outlets.
 

 In early 1985, BP acquired various properties owned by Gulf Oil Company (“Gulf”), including the right to use and license the Gulf logo and trademark in certain parts of the country. At that time, Tidmore’s existing contract with Gulf was re-assigned to BP. Under this contract, BP agreed to supply petroleum products to Tidmore and to permit use of the Gulf brand and logo at approved outlets. Tid-more was also required, by the contract, to obtain BP’s permission before using the Gulf brand and logo at any new locations:
 

 PURCHASER will not display or permit the display of any Gulf indicia at any location that has not been previously approved in writing by SELLER for display of Gulf indicia.
 

 In April 1987, BP and Tidmore entered into a new contract, called the “Branded Jobber Agreement”, in which BP agreed to continue to supply Tidmore with petroleum products. The Agreement reserved to BP the right to determine the use of the Gulf brand.
 

 8.b. It is a condition of the foregoing license that Seller [BP] must approve each outlet, whether operated by Buyer [Tidmore] or by Buyer’s customers, which shall be identified with the Gulf marks and names. Approval will be based on the appearance, location and mode of operation of the outlet.' Seller expressly reserves the right to determine the appropriate geographic density of Gulf branded outlets.
 

 This provision differed from that in the original contract, which had left the approval of Gulf outlets entirely in BP’s discretion. The 1987 Agreement also provided for the release of all claims that either party might have had or asserted against the other arising out of or in connection with any prior agreements, except as to claims for indebtedness and claims specifically reserved in writing.
 

 
 *1383
 
 In November 1986, while the first agreement was still in effect, BP rejected Tid-more’s request to build a Gulf-branded station near the intersection of Highway 280 and Route 119 in the north Shelby County area. BP failed to state any reasons for the denial. When Joe Tidmore asked Ned Barrett (BP’s jobber account representative) to justify the rejection, Barrett allegedly responded, “I don’t know Joe. I don’t make those decisions. I suppose it’s too close to Dewberry.” Dewberry was the site of a BP-operated Gulf station approximately 2.6 miles away.
 

 In September 1987, BP approved a market plan that detailed the locations of existing and planned BP-operated Gulf stations. Between 1987 and 1988, BP undertook to implement that plan by building three new stations in the north Shelby County area, including a station that was closer to Dewberry than Tidmore’s planned station would have been. Concerned that BP was encroaching on its traditional market area, Tidmore requested a meeting with BP representatives. In a series of meetings in February and March 1988, Lance Gremil-lion, BP’s Division Manager of Jobber Sales, Taylor Bassett, BP’s General Manager for Jobber Sales, and Joe Tidmore discussed Tidmore’s concerns, BP’s Market Plan, and possible future sites for Tid-more’s Gulf stations. Gremillion indicated that BP would not approve Tidmore’s proposed sites and then informed Tidmore that BP would not approve any sites within the area defined as “Metro Birmingham”.
 

 B.
 
 Procedural History
 

 Based on BP’s refusal to approve new Gulf-branded outlets, Tidmore brought this action on December 22,1988, alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1; the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. (“PMPA”); and the parties’ Branded Jobbers Agreement.
 

 In its complaint, Tidmore alleged,
 
 inter alia,
 
 that BP’s refusal to authorize use of the Gulf brand imposed nonprice horizontal and vertical restraints in violation of the Sherman Act. Tidmore further alleged that BP’s actions constituted a bad faith partial termination of a franchise agreement in violation of the PMPA and a breach of the Branded Jobbers Agreement.
 

 The district court, in separate orders, granted summary judgment for defendant on all three causes of action. The first order embraced the claims under the Sherman Act and the PMPA.
 
 [1]
 
 The district court held that Tidmore had failed to satisfy the elements of a section 1 violation because it had alleged no facts to support an inference of concerted action. In the second order, the court granted judgment for defendant on the breach of contract claim based on its conclusion that the covenant of good faith and fair dealing was not applicable to the Branded Jobbers Agreement.
 

 C.
 
 Standard of Review
 

 This court reviews the district court’s grant of summary judgment
 
 de novo. McGahee v. Northern Propane Gas Co.,
 
 858 F.2d 1487, 1492-93 (11th Cir.1988),
 
 cert. denied,
 
 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). Summary judgment is appropriate only if the pleadings and evidence in the record demonstrate that there is no genuine issue of material fact as to any issue and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c);
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Although reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, that party “must present affirmative evidence in order to defeat a properly supported motion for summary judgment” to show that there is a genuine issue for trial.
 
 Anderson,
 
 477 U.S. at 257, 106 S.Ct. at 2514;
 
 Matsushita Electric Industrial Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986). Summary judgment is proper if, after adequate time for discovery, the non-moving party fails to establish the existence of an element essential to its case and
 
 *1384
 
 on which that party would bear the burden of proof at trial.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If there is a complete failure of proof on an essential element, there is no longer a genuine issue of material fact.
 
 Celotex,
 
 477 U.S. at 323, 106 S.Ct. at 2552.
 

 We also note that the Supreme Court has recently endorsed the use of summary judgment in antitrust cases in order to avoid chilling legitimate competitive behavior.
 
 Matsushita,
 
 475 U.S. at 594, 106 S.Ct. at 1360.
 

 II. THE SHERMAN ACT CLAIM
 

 The first count in Tidmore’s complaint alleges that the Branded Jobbers Agreement was a contract in restraint of trade in violation of section 1 of the Sherman Act.
 
 [2]
 
 The complaint asserts the existence of both horizontal and vertical restraints. Both claims rely on BP’s refusal to authorize new retail sites; specifically, the claims focus on BP’s refusal to permit the use of the Gulf sign and the Gulf brand at certain proposed locations.
 

 In reviewing the grant of summary judgment, we will begin by assuming that BP’s refusal to authorize new sites limited intrabrand competition in Gulf-branded petroleum products. Section 1, however, does not prohibit
 
 every
 
 act that has the effect of restraining trade. Its scope is more narrow; the Act prohibits only a “contract, combination ... or conspiracy in restraint of trade.” 15 U.S.C. § 1. Despite the different terminology, there is no magic unique to each term. Courts use the words “contract”, “combination”, and “conspiracy” interchangeably, and sometimes simply refer instead to an “agreement”. 6 P. Areeda,
 
 Antitrust Law
 
 ¶ 1403 (1978). The first inquiry, in any section 1 claim, then, is to locate the agreement that restrains trade.
 

 The classic example of such an agreement is an express conspiracy by competitors to fix prices or allocate territories.
 
 United States v. Topco Associates, Inc.,
 
 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). An agreement may also be implied by the conduct of the parties.
 
 American Tobacco Co. v. United States,
 
 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). And, because the Supreme Court has rejected the application of the doctrine of
 
 in pari delicto
 
 in antitrust actions, an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement.
 
 Perma Life Mufflers, Inc. v. International Parts Corp.,
 
 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968).
 

 But, regardless of
 
 how
 
 the agreement is formed, the essential fact is that there must be an agreement. The district court properly held that Tidmore failed to satisfy this element. BP, as the licensor of the Gulf brand and logo, is the exclusive owner of the Gulf name in the area. By refusing to authorize Tidmore to use the Gulf name, BP did no more than exercise its unilateral right to refuse to deal. It is elementary, under the antitrust laws, that a supplier “has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.”
 
 Monsanto Co. v. Spray-Rite Serv. Corp.,
 
 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984);
 
 National Indep. Theatre Exhibitors, Inc. v. Charter Fin. Group, Inc.,
 
 747 F.2d 1396, 1402 (11th Cir.1984),
 
 cert. denied sub nom., Patterson v. Charter Fin. Group, Inc.,
 
 471 U.S. 1056, 105 S.Ct. 2120, 85 L.Ed.2d 484 (1985). Contrary to Tidmore’s characterization of its position as “an unwilling participant”, it was not a participant at all.
 

 The absence of an agreement is strongly suggested by the fact that Tidmore did not, in fact,
 
 agree
 
 to the rejection of the proposed sites. On the contrary, Tidmore lobbied BP for its approval and, failing that, brought this action. Despite the lack of agreement, BP was able to reject the proposed sites and, despite the lack of agree
 
 *1385
 
 ment, BP was able to prevent Tidmore from using the Gulf name at those sites. Tidmore’s agreement or acquiescence was not necessary for BP to effect its decisions, nor was such agreement or acquiescence sought by BP. 6 P. Areeda,
 
 Antitrust Laws
 
 ¶ 1402b4 (1986). Because BP owns the right to use the Gulf logo, it is entitled to decide where, when, and if the name may be used. Its exercise of that right is not a violation of section 1 of the Sherman Act.
 
 Aquachem Co. v. Olin Corp.,
 
 699 F.2d 516 (11th Cir.1983) (holding that defendant’s unilateral refusal to fill an order is not a violation of section l).
 
 [3]
 
 To find an agreement on these facts would be to find an agreement every time a party takes an independent action. This would render the “agreement” element of section 1 a nullity.
 

 This is not to say that all refusals to deal are beyond the reach of the antitrust laws. Courts have found the “agreement” element to be satisfied where a manufacturer uses the threat of termination (1) to coerce retailers to adhere to stated resale prices,
 
 United States v. Parke, Davis & Co.,
 
 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), (2) to coerce compliance with a scheme of exclusive territories,
 
 Graphic Products Distributors, Inc. v. ITEK Corp.,
 
 717 F.2d 1560, 1573 (11th Cir.1983), (3) to coerce the retailer to refrain from selling competitor’s products and to comply with certain tying arrangements,
 
 Perma Life Mufflers,
 
 392 U.S. 134, 88 S.Ct. 1981, and (4) to obtain the buyer’s acquiescence in some other anti-competitive provision,
 
 Eiberger v. Sony Corp. of America,
 
 622 F.2d 1068 (2d Cir.1980) (creating territorial restrictions by enforcing compliance with warranty fees on products sold outside dealer’s territory).
 

 Plaintiff’s attempted reliance on these cases, however, is misplaced. In each, the plaintiff alleged more than a simple refusal to deal. Instead, the threat of such a refusal was used to coerce compliance with an unlawful restraint. It was the buyer’s acquiescence in the unlawful condition— not the mere presence of a contract between the seller and the buyer — that satisfied the section 1 requirement.
 
 Simpson v. Union Oil Co.,
 
 377 U.S. 13, 16, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964) (indicating that a refusal to deal designed to enforce a resale price maintenance scheme would violate section 1). In this case, although BP chose to permit the use of Gulf signs at some locations and not at others, it sought nothing in return. BP, for example, did not condition approval on Tidmore’s compliance with a resale price maintenance scheme, on Tidmore’s purchase of other BP products, or on Tidmore’s agreement not to deal with BP’s competitors. By refusing to deal and seeking nothing in return, BP merely exercised its right, as a licensor, not to approve further use of the Gulf brand.
 

 The Sixth Circuit considered and rejected a similar claim in
 
 Barnosky Oils, Inc. v. Union Oil Co.,
 
 665 F.2d 74 (6th Cir.1981). In that case, the plaintiff, a petroleum jobber, sued the defendant, Union Oil Company, for violation of section 1 of the Sherman Act. Plaintiff alleged that Union Oil had engaged in horizontal territorial allocations under its Jobber Sales Agreement, which required plaintiff to sell all Union products with Union’s name and trademarks and limited use of the Union name to certain pre-approved locations. Barno-sky argued — as Tidmore urges here — that “the requisite joint action is established in this case because it was forced to comply with a contractual arrangement giving Union exclusive control over the placement of Union signs.”
 
 Id.
 
 at 78. The Sixth Circuit found that there was no agreement in restraint of trade.
 

 The facts alleged by Barnosky preclude a finding that Union engaged in any coercive conduct or that Barnosky in any way participated in the alleged territorial allocation. By controlling the placement of its signs, Union was merely exercising its
 
 *1386
 
 right to limit the use of its trade names and trademarks by its customers. Indeed, Union must exercise this control, or risk losing its trademark protection, [citations omitted] In its brief, Barnosky emphasizes the fact that Union’s control over sign post placement is evident from the Jobber Sales Agreement and the Loan Agreement, and that Union referred to those documents in exercising that authority. Those facts are not relevant, because Barnosky did not participate in allocating that authority to Union. Barnosky’s claim that it unwillingly acquiesced in Union’s control over sign placement, and thus participated in a combination, is without merit. Barnosky alleged no facts indicating that its acquiescence in Union’s control was needed, sought, or given.
 

 Id.
 
 at 78-79.
 

 Tidmore’s citation to
 
 American Motor Inns, Inc. v. Holiday Inns, Inc.,
 
 521 F.2d 1230 (3d Cir.1975), does not alter the analysis. In that case, plaintiff, the largest Holiday Inn franchisee, sued Holiday Inns for its failure to approve a proposed site for a franchised hotel. Specifically, plaintiff challenged two provisions of the arrangement: (1) the company-town policy, under which franchisees were barred from competing in towns where company-owned inns are located; and (2) the non-Holiday Inn clause, under which franchisees were prohibited from owning hotels other than those licensed by Holiday Inn. The Third Circuit found that although the company-town policy, standing alone, would be inadequate to evidence an agreement, the combination of that policy with the non-Holiday Inn clause did suffice.
 
 Id.
 
 at 1253. Taken together, the provisions worked to preclude the franchisees from operating either Holiday Inns or non-Holiday Inns in cities where the defendant operated an Inn.
 
 Id.
 
 at 1254. As a result, plaintiff’s aequi-escence in the non-Holiday Inn clause converted a permissible company-town policy into an actionable territorial restraint.
 

 Tidmore has made no allegation that it was subject to restrictions similar to the non-Holiday Inn clause. On the contrary, Tidmore has conceded that it was permitted to distribute oil from other suppliers and, indeed, that it could even have purchased oil from BP for sale at the proposed sites— as long as Tidmore did not use the Gulf name. The agreement to allocate territories is thus absent in this case: rather, BP has “merely exercised its unilateral power to deny requests for signs and related equipment.”
 
 Barnosky Oils,
 
 665 F.2d at 80.
 
 [4]
 

 III. THE BREACH OF CONTRACT CLAIM
 

 Tidmore alleged that BP refused to approve Tidmore’s proposed sites because of BP’s desire to expand its own facilities and to squeeze jobbers (like Tidmore) out of certain areas. In Tidmore’s view, BP’s rejection constituted a breach of the 1987 Branded Jobbers Agreement under two theories: (1) the rejection was in violation of the express terms of the Agreement, and (2) the rejection constituted a breach of the implied covenant of good faith and fair dealing.
 

 A.
 
 The Branded Jobbers Agreement
 

 Tidmore argues that BP’s refusal to authorize new Gulf-branded sites in 1988 constituted a breach of the 1987 Branded Jobbers Agreement, because the refusal was based on BP’s plan to limit Tidmore’s ability to compete. The parties agree that, under Paragraph 8.b. of the Agreement, BP was entitled to reject a proposed site for any of four reasons: (a) appearance, (b)
 
 *1387
 
 location, (c) mode of operation, and (d) density.
 

 The district court found no evidence to refute BP’s contention that its refusal was based on plans to build BP owned and operated stations at or near the sites requested by Tidmore. Although this justification has the obvious effect of limiting Tidmore’s ability to compete, that is a power expressly granted to BP by the Agreement:
 

 Seller expressly reserves the right to determine the appropriate geographic density of Gulf branded outlets.
 
 [5]
 

 Tidmore thus has no claim that BP breached the express terms of the Agreement.
 

 B.
 
 The Implied Covenant of Good Faith and Fair Dealing
 

 Tidmore’s alternate claim is that BP exercised its discretion under the contract in such a way as to defeat Tidmore’s reasonable expectations — a violation of the implied covenant of good faith and fair dealing.
 

 There is a substantial question as to whether the implied covenant provides a basis for a cause of action under Alabama law. In Alabama, the good faith provision of the Uniform Commercial Code, Ala.Code Ann. § 7-1-203, does not create a cause of action either in contract or in tort.
 
 Government Street Lumber Co. v. AmSouth Bank, N.A.,
 
 553 So.2d 68 (Ala.1989). The provision is intended to be “directive rather than remedial.”
 
 Id.
 
 at 72. Tidmore’s claim must then arise, if at all, under the common law.
 

 Although Alabama has recognized that “every contract implies an obligation of good faith and fair dealing,”
 
 Hoffman-La Roche, Inc. v. Campbell,
 
 512 So.2d 725, 738 (Ala.1987), it has spoken little about the contours of this obligation. The covenant is designed to “preserve the spirit of the contract rather than the form” and to protect the reasonable expectations of the par ties.
 
 Id.
 
 The intent of the covenant is to ensure that “a contracting party shall not try to deprive the other of the consideration for which he bargained.”
 
 Id.
 

 Tidmore has offered no evidence that BP’s conduct deprived Tidmore of the benefit of the bargain. It is undisputed that the Agreement nowhere promised Tidmore that any proposed sites would be approved. Further, Tidmore concedes that it relinquished no rights in accepting the Branded Jobbers Agreement. The Agreement nowhere precluded Tidmore from marketing other brands of gasoline in those same areas. Tidmore’s inability to achieve the market dominance it had envisioned does not convert BP’s exercise of its rights under a contract into a breach of that contract.
 
 See, e.g., Hubbard Chevrolet Co. v. General Motors Corp.,
 
 873 F.2d 873, 877-78 (5th Cir.1989) (applying Michigan law) (holding that the implied covenant has no role in the face of express contract terms);
 
 Davis v. Sears, Roebuck and Co.,
 
 873 F.2d 888, 895 (6th Cir.1989) (applying Georgia law) (holding that “there can be no breach of a covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do”). BP’s conduct did not deprive Tid-more of the consideration for which it bargained.
 

 IV. CONCLUSION
 

 Based on the foregoing analysis, we find that the district court correctly granted summary judgment to BP on the antitrust and breach of contract claims. Accordingly, the judgment of the district court is AFFIRMED.
 
 [6]
 

 [1]
 

 . Tidmore has not appealed the adverse judgment on the claim under the PMPA.
 

 [2]
 

 . Section 1 of the Sherman Act, in pertinent part, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.” 15 U.S.C. § 1.
 

 [3]
 

 . Although a simple refusal to deal fails to state a claim under section 1, such an act could be relevant to a claim under section 2, the monopoly provision.
 
 Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.,
 
 919 F.2d 1517, 1522 (11th Cir.1990). Section 2 proscribes a unilateral refusal to deal "when accompanied by the intent to monopolize and the requisite degree of monopoly power.”
 
 Id.
 
 at 1522. Plaintiff, however, has not alleged a section 2 claim, nor, on these facts, does it appear that such a claim could be made.
 

 [4]
 

 . In light of our holding that no agreement existed, we need not resolve whether an agreement between Tidmore and BP should be analyzed as a horizontal restraint because BP acts as a dual distributor. It is doubtful, however, that the mere fact that BP acts as both a supplier and a dealer would convert a vertical restraint into a horizontal one.
 
 See, e.g., Midwestern Waffles, Inc. v. Waffle House, Inc.,
 
 734 F.2d 705, 720-21 (11th Cir.1984) (noting trend of courts to view dual distributor and independent franchisee as vertical relationship).
 
 See also
 
 Department of Justice,
 
 Vertical Restraint Guidelines,
 
 50 Fed.Reg. 6263, 6265 (1985) (announcing Department policy).
 

 [5]
 

 . Although Tidmore is correct in noting .that BP stipulated that it "has never said that the decision was based upon density,” it would be misleading not to point out that this stipulation referred only to the rejection of Tidmore’s proposed site in 1986, not to the rejection in 1988. (Joint Statement of Generally Undisputed Facts, R2-56-¶ 15).
 

 [6]
 

 . Tidmore has, in addition, appealed the district court’s denial of leave to amend its complaint.
 
 *1388
 
 This decision is reviewable only for abuse of discretion.
 
 Zenith Radio Corp. v. Hazeltine Research, Inc.,
 
 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). We find that the district court correctly denied the motions on the grounds of futility and undue delay.
 
 Local 472 of United Ass'n of Journeymen and Apprentices v. Georgia Power Co.,
 
 684 F.2d 721, 724 (11th Cir.1982).