[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15326

_____

D.C. Docket No. 1:12-cv-24356-JG

PROCAPS S.A.,
a Colombian sociedad anonima,

                                                            Plaintiff - Appellant,

versus

PATHEON, INC.,
a Canadian corporation,

                                                            Defendant - Appellee,

SOBEL USA, INC.,
a Delaware corporation, et al.,

                                                            Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 30, 2016)

Before MARCUS and DUBINA, Circuit Judges, and GOLDBERG,[*] Judge.

---

[*] Honorable Richard W. Goldberg, Judge for the United States Court of International Trade, sitting by designation.

MARCUS, Circuit Judge:

In this Sherman Act, 15 U.S.C. § 1, antitrust case, Procaps S.A. ("Procaps") sued its former joint venture partner, Patheon, Inc. ("Patheon"). Both Procaps and Patheon are involved in the market for softgel services, i.e., the business of designing and manufacturing gel capsule delivery mechanisms for medications. In January 2012, Procaps and Patheon entered into an agreement (the "Collaboration Agreement") to combine forces and create a more effective competitor in the United States softgel market. This Collaboration Agreement allocated some aspects of the business to Procaps and others to Patheon; both parties agree that the Collaboration enhanced competition at the outset.

Less than one year into the Collaboration, Patheon acquired Banner Pharmacaps ("Banner"), still another player in the business of designing and manufacturing softgels. Once it learned about the Banner acquisition, Procaps refused to participate in the Collaboration any further, because, it concluded, the Banner acquisition transformed the once-lawful Collaboration Agreement into a horizontal market allocation in restraint of trade. Instead, Procaps filed suit in the United States District Court for the Southern District of Florida alleging that Patheon's conduct violated Section 1 of the Sherman Act. The district court ultimately granted summary judgment to Patheon, holding that Procaps had failed

2

to adduce evidence of "actual anticompetitive effects" sufficient to survive summary judgment.

On appeal, Procaps argues that the trial court should have applied the per se rule, rather than rule of reason analysis, in order to determine whether Patheon had violated Section 1 of the Sherman Act, but that even when measured against the rule of reason, Procaps had presented sufficient evidence of anticompetitive effects to survive summary judgment. After thorough review and having the benefit of oral argument, we conclude that Patheon was entitled to summary judgment both because Procaps has failed to establish the foundational requirement of concerted action necessary to maintain a Section 1 claim under the Sherman Act, and because Procaps also failed to show any actual anticompetitive effects. Accordingly, we affirm.

## I.

### A.

The essential (and undisputed) facts drawn from an extensive summary judgment record are these. Both Procaps and Patheon are in the business of providing softgel services to pharmaceutical companies. Softgels are gelatin capsules that serve as oral delivery mechanisms for medications. There are two major steps necessary to provide softgel services: first, the softgel services provider must design the softgel to accommodate the specific medication it is

3

designed to deliver, and then, the softgel services provider must devise a process for creating that softgel-medication combination on a commercially viable scale. In the industry, the first step generally is referred to as product development services ("PDS") and the second as contract manufacturing operations ("CMO").

The relevant market is further segmented based on the kind of medication provided: prescription medications, over the counter medications ("OTC"), or nutritional supplements. Obtaining a contract to provide services for prescription or OTC softgels is significantly more difficult than obtaining a contract to provide services for nutritional supplements, due in substantial measure to the overlay of FDA regulations. Moreover, it is difficult to develop the expertise needed to break into the prescription and OTC markets without significant hands-on experience developing softgels, and so new entrants often begin by targeting customers seeking services for nutritional supplements. Many never make it past this initial step.

In the softgel services market, pharmaceutical companies solicit bids from softgel services providers. Providers compete not only on the basis of price but also on a series of key contractual terms including initial pricing, pricing escalation, capital investment obligations, exclusivity provisions, limitations on liability, take-or-pay provisions, and agreements to reserve capacity. Pharmaceutical companies value softgel services providers with a global presence,

4

and particularly favor those suppliers with substantial American or European manufacturing capacity.  All other things being equal, those firms enjoy a competitive advantage.

Before the parties here entered into the Collaboration Agreement, Procaps and Patheon had each made an effort to break into the American softgel services market without much success.  While both companies had their strengths, each was hamstrung by significant flaws.  Procaps boasted a substantial manufacturing capability and valuable intellectual property, but its aspirations were stymied by its lack of marketing operations in the United States and a stigma attached as being a Colombian company.  Patheon, in contrast, had little in the way of softgel-related intellectual property or manufacturing capacity, but it did have longstanding relationships with American pharmaceutical companies and an impressive marketing operation.  Thus, in January 2012, Procaps and Patheon decided to pool their complementary attributes to create a new, more effective competitor in the American softgel market.  On January 10, 2012, the two companies executed the Collaboration Agreement to market their combined softgel development and manufacturing services under the "P-Gels" brand.  Under the Collaboration Agreement, Patheon would market the brand using its connections in the American market, manufacturing opportunities would be allocated exclusively to Procaps, and product development opportunities would be allocated between the parties as

5

they arose by mutual agreement.  Both parties were prohibited from competing with the Collaboration in the market covered by the Collaboration Agreement.

The Collaboration Agreement also contained express provisions to deal with the contingency that Procaps or Patheon could acquire a company that might infringe on the exclusivity provisions:

> If during the Term a Party or any of its Affiliates acquires an entity by a Change of Control of a Third Party that would cause such Party or its Affiliates to be in breach of Sections 10.2 or 10.3 at the closing of such acquisition, then the acquiring party shall give advance notice to the other Party or make a public announcement of such acquisition, and the acquiring party must within six (6) months of such acquisition either (i) divest such portion of the acquired business that would be restricted by Sections 10.2 or 10.3 to a Third Party, or (b) include under this Agreement such portion of the acquired business solely with respect to any business or intellectual property activities conducted by the acquiring Party following the date of such acquisition.

The Collaboration Agreement also set forth specific dispute resolution procedures to govern conflicts "arising out of, relating to or in connection with" the Collaboration Agreement.  Antitrust claims and certain intellectual property claims were expressly excluded from these dispute resolution procedures.

Originally, the Collaboration Agreement covered prescription softgels only, but the parties later expanded its scope to cover OTC products and services for ten enumerated customers.  By August 2012, the Collaboration had submitted forty-three proposals but won only two contracts, valued at a total of $123,003.

During early to mid-2012, without Procaps's knowledge, Patheon was involved in negotiations to acquire Banner. Unlike Patheon, Banner had substantial manufacturing capabilities. Patheon informed Procaps of the planned acquisition on October 22, 2012, and proposed several ideas -- at a high level of generality -- for incorporating the Banner assets into the Collaboration. Procaps, however, independently determined that going forward with the Collaboration would violate antitrust law. Procaps immediately "put everything on standby," communicated to Patheon that it would not continue to participate in the allocation of customers contemplated by the Collaboration, and filed the instant lawsuit seeking damages and equitable relief based on alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq. After receiving a copy of the Complaint, Patheon offered to terminate the Collaboration, but Procaps refused.

On December 14, 2012, Patheon closed on the Banner acquisition. To facilitate compliance with the Collaboration Agreement, Patheon appointed David Hamby to serve as a gatekeeper. Relying on the terms of the Collaboration Agreement, Hamby would determine whether any particular manufacturing opportunity fell within the ambit of the Collaboration. If it did, the opportunity would be sent to Procaps; if not, the opportunity would go to Banner or would not

be pursued.  Because Procaps had "suspended its performance," Procaps refused to accept any opportunities allocated in this manner.  Patheon continued to operate in this way until July 18, 2013, when Patheon terminated the Collaboration due to what it viewed as Procaps's noncompliance.  Patheon then began pursuing opportunities within the scope of the Collaboration Agreement using Banner assets.

## B.

In its complaint, among other things, Procaps specifically alleged that the Banner acquisition placed Patheon in direct competition with Procaps, thus transforming the parties' legitimate joint venture into a per se illegal horizontal restraint in violation of Section 1 of the Sherman Act.

Patheon moved to dismiss the complaint, arguing that Procaps had alleged only a per se claim, whereas the Collaboration Agreement should be evaluated under the rule of reason because of its potential for procompetitive efficiencies. Citing Palmer v. BRG of Georgia, Inc., 498 U.S. 46 (1990), the district court concluded that Procaps's per se Section 1 claim survived dismissal because Procaps had sufficiently alleged a horizontal market allocation agreement.

Soon thereafter, the parties consented to jurisdiction before a magistrate judge, and filed cross motions for summary judgment.  Among others, Patheon argued that there was no concerted action because Procaps never agreed with

8

anyone to restrain trade, that rule of reason analysis applied rather than the per se rule, and, finally, that because Procaps was only pursuing a per se theory, Patheon was entitled to summary judgment. For its part, Procaps continued to urge that the once-lawful Collaboration Agreement was transformed into an illegal horizontal market allocation that was subject to per se rule analysis and, therefore, that there was no need to proceed to a full rule of reason analysis.

The magistrate judge denied both motions in large part. It rejected Patheon's arguments regarding the lack of concerted action, reasoning that the Collaboration Agreement standing alone was sufficient to meet the concerted action requirement of Section 1 of the Sherman Act. The court did, however, agree with Patheon that the per se rule did not apply and determined that Procaps could pursue a rule of reason theory. After additional discovery, Patheon moved once again for summary judgment, which the trial court granted in a thoughtful and detailed analysis on the ground that Procaps had failed to establish any actual detrimental effects on competition.

Procaps timely appealed from the entry of final summary judgment for Patheon.

## II.

We review a grant of summary judgment de novo, applying the same standard as the district court. Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d

9

1229, 1236 (11th Cir. 2003).  In conducting this analysis, we "view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 342 (11th Cir. 2012) (quotation omitted).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of presenting "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that establish the absence of any genuine, material factual dispute."  Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1272 (11th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)).

Section 1 of the Sherman Act broadly declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ."  15 U.S.C. § 1.  "A contract is a compact between two or more parties."  McGuire v. Sadler, 337 F.2d 902, 905 (5th Cir. 1964) (quotation omitted).[1]  Similarly, "[i]n any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit."  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752,

---

[1] Decisions of the Fifth Circuit, issued prior to the close of business on September 30, 1981 are binding precedent in this Circuit.  Bonner v. City of Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

769 (1984); see also McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) ("[A] conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan.").  And like a contract or a conspiracy, a "combination" also "mean[s] . . . an agreement between two or more persons."  Gorham & Johnson, Inc. v. Chrysler Corp., 308 F.2d 462, 468 (5th Cir. 1962).  "Despite the different terminology, there is no magic unique to each term.  Courts use the words 'contract,' 'combination,' and 'conspiracy' interchangeably."  Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prod. Div., a Div. of BP Oil Co., 932 F.2d 1384, 1388 (11th Cir. 1991).  The common element to a "contract, combination . . . , or conspiracy" is a requirement of concerted action.  Copperweld, 467 U.S. at 767–68.  Therefore, to establish a Section 1 violation, the plaintiff must first show that there was concerted action between two or more persons -- a "conscious commitment to a common scheme designed to achieve an unlawful objective" -- in restraint of trade.  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984).

In essence, Procaps argues that the Collaboration Agreement -- although lawful at inception -- was transformed into an illegal restraint of trade by Patheon's acquisition of Banner.  But, because Procaps has wholly failed to establish concerted action in restraint of trade, this argument fails.

11

Notably, the parties agree that the Collaboration Agreement was lawful at its inception. After all, the Collaboration Agreement created a legitimate joint venture that the parties hoped would be a more effective competitor in the American softgels market. The Agreement allocated the marketing responsibilities to Patheon and the manufacturing opportunities to Procaps. Like most joint venture agreements, the Collaboration Agreement provided that the two parties would not compete with each other within the scope of the Agreement. As part of these exclusivity provisions, Patheon agreed not to use its assets to pursue manufacturing opportunities within the United States. The Collaboration Agreement also provided that if Procaps or Patheon acquired an entity that put either party in breach of the exclusivity provisions, the acquiring party had two options: it could either divest any assets that violated the exclusivity provisions or figure out a way to include those assets within the Collaboration Agreement.

Procaps nonetheless argues that the Banner acquisition later transformed the Agreement into an illegal market allocation because the Agreement required Patheon to remove any Banner assets from the market. But the Collaboration Agreement required no such thing. The Agreement did not provide for the Banner acquisition, nor did it expressly require the removal of the Banner assets. Patheon chose to remove the Banner assets from the market, but Procaps never agreed to that. In fact, Procaps adamantly refused to participate in the Collaboration

12

Agreement from the minute it learned of the Banner acquisition. Indeed, Procaps's executives declared that Procaps "w[as] not going to participate in [the post-acquisition Collaboration Agreement]." "[W]e said. . . absolutely no, we have never done any illegal things, we're not going to start doing illegal things and it was clear from day one." We also note that although Procaps refused to participate in the post-acquisition Agreement, Procaps also refused to terminate the Collaboration, despite many offers from Patheon to do so.[2] Regardless, because Procaps never made a "conscious commitment to a common scheme" to illegally restrain trade, the Collaboration Agreement cannot form the basis for a Section 1 claim. See Monsanto Co., 465 U.S. at 768.

We cannot accept Procaps's argument that the simple existence of the contract -- the Collaboration Agreement -- standing alone, is enough to satisfy the concerted action requirement. While all contracts restrain trade to some extent, the Supreme Court has read "in restraint of trade" as used in Section 1 to prohibit only

---

[2] Patheon argued in district court that the doctrine of "unclean hands" independently barred Procaps's lawsuit. Our prior opinions have not been clear as to whether this theory is viable in the antitrust arena. Thus, for example, relying on Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134 (1968), a panel of this Court observed in dicta that "because the Supreme Court has rejected the application of the doctrine of in pari delicto in antitrust actions, an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement." Tidmore Oil Co., 932 F.2d at 1388. But later, also in dicta, another panel clarified that "Perma Life Mufflers explicitly left open the possibility that a defense of active involvement could bar a complaint about an antitrust conspiracy." Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1156 (11th Cir. 2006). It would be odd indeed to allow Procaps to challenge the very agreement it had consummated on the grounds that it was an unlawful one, but because Procaps has not established that the Collaboration Agreement was an unlawful agreement in the first place, we need not resolve the matter today.

13

those contracts that unreasonably restrain trade.  See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 98 (1984).  Therefore, although Section 1 specifically references contracts, we have held that a contract can serve as the basis for a Section 1 claim only if it embodies an agreement to unlawfully restrain trade.  Tidmore Oil Co., 932 F.2d at 1388.  Were this not the case, contractual partners would potentially be on the hook for any future conduct the other party engages in under color of the contract.  Such a rule could dissuade firms from pursuing joint ventures in the first place -- collaborations that we have recognized often provide "otherwise unattainable procompetitive benefits."  See, e.g., Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc., 779 F.2d 592, 601 (11th Cir. 1986).  It only takes a slight variation on the facts of this case to illustrate the problem with Procaps's argument.  Thus, for example, assume that, rather than Procaps suing Patheon, a pharmaceutical company had sued both Procaps and Patheon.  On Procaps's reasoning, Procaps would be liable for treble damages despite the fact that it had nothing to do with the removal of the Banner assets.  This is not the law.  Because there was never any concerted action between Procaps and Patheon to unlawfully restrain trade, Procaps cannot make out a Section 1 claim based on the Collaboration Agreement.  The Collaboration Agreement was lawful at the outset (as all of the parties concede) and it was never transformed into an illegal arrangement between two or more parties.

14

To the extent that Procaps seeks to find the requisite duality or concerted activity between Patheon and Banner, that effort is also unavailing. At one time, this argument may have been viable under the intra-enterprise conspiracy doctrine, but the Supreme Court has long since rejected the doctrine. Copperweld, 467 U.S. at 777. In Copperweld, the Supreme Court explained that Section 1 draws a distinction between concerted and independent action because the former "inherently is fraught with anticompetitive risk." Id. at 768–69. Concerted action "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." Id. at 769. However, coordination between a corporation and its wholly owned subsidiary does not present the same risk because these entities already share a singular economic interest. Id. at 769–70. And so, the Supreme Court held that such coordination is not concerted action for purposes of the Sherman Act. Id. at 777.

Following Copperweld, it is now basic hornbook law that a company and its wholly owned subsidiary are legally incapable of conspiring for purposes of a Section 1 claim. Id. Accordingly, in Section 1 antitrust cases where the defendant has undergone a merger during or around the time of the challenged conduct, courts have been careful to distinguish between pre- and post-merger conduct. See, e.g., Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1029 (10th Cir. 2002) (rejecting the plaintiff's Section 1 claim because "Novell's post-merger actions

15

taken alone are just as consistent with permissible competition agreed to after the merger as they are with an illegal conspiracy agreed to before the merger") (quotation omitted); Sterling Merch., Inc. v. Nestle, S.A., 724 F. Supp. 2d 245, 273 (D.P.R. 2010), aff'd, 656 F.3d 112 (1st Cir. 2011) ("Sterling's allegations that Nestlé and Payco have illegally conspired to monopolize the ice cream distribution market necessarily fail as to all post-merger acts, because the coordinated acts of parent companies and their subsidiaries cannot constitute a Sherman Act claim for conspiracy."). Again, Procaps has not challenged the merger itself as anticompetitive, and because it does not challenge any pre-merger conduct between Banner and Patheon, all that remains is Patheon and Banner's post-merger conduct; therefore, any claim that Banner was Patheon's co-conspirator is dead in the water. See Copperweld, 467 U.S. at 777.

Section 1 targets concerted action, not independent action. Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 190 (2010). Here, all of the alleged anticompetitive effects arose from Patheon's unilateral decision to remove the Banner assets from the market, to which Procaps never acquiesced. Under Copperweld, Patheon's post-merger coordination with Banner is insufficient as a matter of law to support a Section 1 claim. And there is simply no other basis for finding any concerted action between two or more parties required for a Section 1

16

claim.  Having failed to establish concerted action, Procaps cannot establish an illegal agreement or conspiracy in restraint of trade.

### III.

The magistrate judge granted summary judgment to Patheon on the alternative ground that Procaps had failed to establish that the restraint had anticompetitive effects.  We agree with this conclusion, which offers a wholly independent basis for granting summary judgment to Patheon.  Before we turn to the issue, however, we are required to first address Procaps's suggestion that the magistrate judge should have applied the per se rule and presumed anticompetitive effects rather than the more commonly applied rule of reason.

We start with the general assumption that the rule of reason applies.  Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006); Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1567 (11th Cir. 1991).  The per se rule is reserved only for those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality," Nat'l Soc. of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978), or that are "naked restrain[ts] of trade with no purpose except stifling of competition," Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 20 (1979) (quotation omitted).  Put differently, the per se rule applies "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of

17

liability." Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1549 (11th Cir. 1996) (quotation omitted). Indeed, a panel of this Court has observed that "the per se label should be applied infrequently and with caution." Seagood Trading Corp., 924 F.2d at 1567.

Procaps argues, nevertheless, that simply because the post-acquisition agreement was a horizontal market allocation agreement between competitors, we are required to apply the per se rule. See Palmer v. BRG of Georgia, Inc., 498 U.S. 46 (1990). We remain unpersuaded. Palmer did not involve allegations that a lawful, procompetitive joint venture was somehow transmuted into an unlawful horizontal market allocation by the unilateral conduct of one of the parties; rather, it presented a simpler case of two competitors agreeing to not compete in particular markets, uncoupled from any legitimate joint venture. Id. at 49–50. In Palmer, BRG and HBJ, the two primary bar review providers in Georgia, entered into an agreement that gave BRG the exclusive right to use HBJ's material in Georgia and required BRG to forgo pursuing business outside of Georgia. Id. at 46–47. "The revenue-sharing formula in the 1980 agreement between BRG and HBJ, coupled with the price increase that took place immediately after the parties agreed to cease competing with each other in 1980, indicates that this agreement was formed for the purpose and with the effect of raising the price of the bar review course." Id. at 49 (quotation omitted). Because this agreement served no purpose other than to

18

allocate territories and thus raise the price of bar review courses, the per se rule applied. Id. at 49–50.

Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies. See, e.g., Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 344 F.3d 1294 (11th Cir. 2003). Thus, for example, Valley Drug involved what could reasonably be described as a series of market allocation agreements: pursuant to a series of settlement agreements, a patent holder paid fees to its potential competitors, and those competitors agreed not to enter the market, allocating the entire market to the patent holder. Id. at 1304. But because the agreements raised the issue in a new factual context with which we did not have a great deal of experience, this Court held that the per se rule should not apply. Id.; see also Broad. Music, Inc., 441 U.S. at 23 ("Not all arrangements among actual or potential competitors that have an impact on price are per se violations of the Sherman Act or even unreasonable restraints."); In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1008–14 (7th Cir. 2012) (applying the rule of reason because the output restricting agreements arose in a novel factual context).

Like Valley Drug, we do not have a great deal of experience with the kind of case at issue here. Neither party could point to a case in which a legitimate, procompetitive joint venture was transformed into an anticompetitive market

19

allocation as a result of the unilateral conduct of one of the parties.  Moreover, both parties have pointed to some procompetitive efficiencies that might flow from the Collaboration Agreement, even post-acquisition.  For example, a Patheon executive offered that some Banner products might be cheaper to produce in Procaps's Colombian facilities than in Banner's American facilities.  And a Procaps executive theorized that the addition of Banner's FDA-approved American facilities could make the joint venture more competitive in the OTC market sector. In this context, the application of the per se rule is inappropriate.[3]  We are not prepared to condemn the Collaboration Agreement out of hand.  Accordingly, we agree with the magistrate judge's decision to apply the rule of reason.

Applying the rule of reason, we ask whether Procaps has shown that the alleged restraint has had an anticompetitive effect on the market.  To do so, it may establish either (1) that the restraint had an "actual detrimental effect" on competition, or (2) that the restraint had the potential for genuine anticompetitive effects and that the conspirators had market power in the relevant market.  Levine, 72 F.3d at 1551 (quoting FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460–61 (1986)); see also Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc., 123 F.3d

---

[3] These same reasons confirm that the quick look doctrine would also be inapplicable.  The quick look doctrine falls somewhere between the conclusive presumption of the per se rule and the more searching rule of reason analysis.  It applies where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  See California Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  The effects of the arrangements in this case are far from readily apparent.

20

301, 311 n.20 (5th Cir. 1997) ("To the extent that DHJ relies on proof of the tendency of the defendants' actions to have anticompetitive effects, as opposed to actual anticompetitive effects, DHJ must also establish market power in the relevant market in order to recover under Section 1."). By the time of the second summary judgment briefing, Procaps had bound itself to proceed only on the first theory -- that there were actual detrimental effects on competition.

Under our precedent, "[a]ctual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1339 (11th Cir. 2010). Significantly, a plaintiff may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions; rather, we have repeatedly required a plaintiff to point to specific facts demonstrating harm to competition. See, e.g., id. ("The plaintiff has the burden of demonstrating damage to competition with specific factual allegations.") (quotation omitted); Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1072–73 (11th Cir. 2004) ("Although damage to a critical competitor may also damage competition in general, [the plaintiff] bears the burden of drawing that implication with specific factual allegations."). Procaps has failed to point to any actual detrimental effects. It has presented no evidence of an actual reduction in output, or increase in price, or deterioration in quality.

21

Procaps argues, however, that it has met the burden of establishing actual anticompetitive effects by presenting expert testimony, a series of emails demonstrating that potential customers were precluded from receiving bids from the Banner assets after they were removed, and internal Patheon documents that say that the Banner assets were removed from "a large share of the target market." None of this evidence, however, comes close to establishing actual effects.

For starters, Procaps's expert economist, Dr. Roger Blair, opined that "[t]he effect of removing the Banner assets from the relevant markets is to raise price, reduce quantity, and reduce consumer welfare" because "[t]hese are the predictable anticompetitive consequences of a horizontal market sharing agreement." (emphasis added). However, Dr. Blair based his predictive opinion not on any specific examples of such effects, but on hypothetical supply and demand curves that one might expect to find in any first-year economics textbook. In the section of his report entitled "Actual Anticompetitive Effects of Patheon's Market Division," he simply restated that the removal of a competitor is "necessarily anticompetitive." Procaps's other expert, David Heyens -- a former executive of Catalent Pharma Solutions, which was the dominant player in the American prescription and OTC softgels market -- opined similarly that the removal of Banner would have resulted in worse outcomes for consumers. But he too relied only on inferences drawn from his abstract understanding of market conditions

22

rather than from pointing to any particular data.  Notably, at his deposition, Heyens acknowledged that his report did not observe that prices were actually higher or that quality was actually worse, or finally that output was actually decreased.  And, although his report said that removal of the Banner assets would likely have an impact on the contracts that would be negotiated, he admitted that he did not determine any actual impact on those contract provisions.  More tellingly, when questioned about his own experience as a Catalent executive, he admitted that Catalent neither raised prices, nor changed any contract terms when the Banner assets were removed because Catalent was not aware that the assets had been withdrawn.

Expert testimony of the kind Procaps offered regarding the likely effect of removing a competitor cannot take the place of presenting specific and concrete facts.  We made that point clear in Spanish Broadcasting:  "Although damage to a critical competitor may also damage competition in general, [the plaintiff] bears the burden of drawing that implication with specific factual allegations."  376 F.3d at 1072–73.  Were theoretical effects stated only at the highest level of abstraction enough, a plaintiff could trot out these same basic principles any time conduct resulted in harm to a competitor.  The Sherman Act requires more.

Moreover, the emails and Patheon's internal documents, whether reviewed alone or in concert, are not enough to establish actual anticompetitive effects.

23

These documents tell us nothing more than that the Banner assets were removed. We have held that this is not sufficient -- on its own -- to establish harm to competition. See Spanish Broadcasting, 376 F.3d at 1072–73. And we are not alone in holding that more than harm to an individual competitor is required. See, e.g., Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc., 123 F.3d 301, 311 (5th Cir. 1997) (concluding that alleged injury to a competitor alone was insufficient to establish harm to competition); Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993) (explaining that the "plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice"); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1414 (9th Cir. 1991) (proof "that one nurse anesthetist no longer works at one hospital . . . is not enough to demonstrate actual detrimental effects on competition"); Prod. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663 (7th Cir. 1982) ("Now there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated.").

Procaps urges us to relax the actual effects standard based on isolated snippets from the Supreme Court's decision in FTC v. Indiana Fed'n of Dentists, 476 U.S. 447 (1986) ("IFD"). Again, we are unpersuaded. In IFD, the Supreme

24

Court concluded that a dental association's concerted refusal to supply x rays to insurers was illegal. Id. at 465–66. As part of its reasoning, the Court observed:

> A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence.

Id. at 461–62. Procaps insists that this "likely enough" language entitles it to prove actual effects with predictive notions.

But IFD cannot be read to compel a general relaxation of the actual effects standard. Indeed, as we've observed, both this Court and our sister circuits have continued to require some empirical evidence of actual effects following IFD. See, e.g., United States v. Am. Express Co., 838 F.3d 179, 205–06 (2d Cir. 2016) (explaining that "Plaintiffs might have met their initial burden under the rule of reason by showing either that cardholders engaged in fewer credit-card transactions (i.e., reduced output), that card services were worse than they might otherwise have been (i.e., decreased quality), or that Amex's pricing was set above competitive levels within the credit-card industry (i.e., supracompetitive pricing)," but their claim failed because they offered no evidence to prove such adverse effects); Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998) (an affidavit "which discussed Quality's high market share and the

competitive advantages that could have resulted in <u>potentially</u> higher prices, but significantly did not allege that prices were <u>actually</u> higher in the Jamestown market" was insufficient to establish actual effects); <u>Flegel v. Christian Hosp., Ne.-Nw.</u>, 4 F.3d 682, 688–89 (8th Cir. 1993) (affidavits from referring physicians asserting that the excluded urologists provided higher quality care were insufficient to establish evidence of actual effects); <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 546 (2d Cir. 1993) (plaintiff radiologists' assertion that their exclusion from health maintenance organization ("HMO") would result in increased prices and reduced quality to the HMO's patients was insufficient to establish actual effects in the absence of any demonstrable change in price or quality); <u>Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.</u>, 823 F.2d 829, 832 (4th Cir. 1987) (rejecting expert testimony that asserted harm to competition based "on general economic theory" rather than "market surveys or other studies of the relevant market").

Moreover, <u>IFD</u> is distinguishable for at least two significant reasons. First, <u>IFD</u> was primarily a quick look case. <u>See</u> <u>California Dental</u>, 526 U.S. at 770 (characterizing <u>IFD</u> as the basis for quick look). Second, the evidence in that case showed that the restraint was actually very successful, rendering insurers entirely unable to obtain x rays in some locales -- i.e., it actually affected the market in a

26

concrete and palpable way.  IFD, 476 U.S. at 460–61.  Here, there is no evidence --

none -- that the alleged restraint had a market-wide effect on anything.

In one last effort, Procaps argues that being required to prove actual effects

would have required that it proceed in concert with Patheon until there was

sufficient "blood on the floor" to make the requisite showing.  Procaps says that

requiring the establishment of actual effects essentially penalizes it for not

continuing to participate in Patheon's illegal scheme.  However, Procaps cites no

authority for the assertion that the difficulty of making such a showing excuses it

from doing so.  That actual effects are sometimes difficult to establish does not

relieve Procaps of its burden.  See, e.g., Orson, Inc. v. Miramax Film Corp., 79

F.3d 1358, 1367 (3d Cir. 1996) (noting that proof of actual effects "is often

impossible to make"); United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir.

1993) (same).  Simply put, because Procaps presented no specific and concrete

factual evidence of actual effects, it has failed to meet its burden.

At bottom, this is essentially a breach of contract case -- and so Procaps's

failure to support an antitrust theory is not all that surprising.  As the First Circuit

has observed, "[s]ome antitrust cases are intrinsically hopeless because . . . they

merely dress up in antitrust garb what is, at best, a business tort or contract

violation."  Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373

F.3d 57, 69 (1st Cir. 2004).  This is such a case.  Because Procaps cannot establish

concerted action, it cannot maintain a Section 1 claim.  And because Procaps failed to adduce concrete evidence of actual anticompetitive effects, it cannot establish that any claimed restraint was unreasonable.  Either reason is sufficient to sustain the magistrate judge's grant of final summary judgment in favor of Patheon. Accordingly, we affirm.

**AFFIRMED.**